# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

01 DEC -7  PH 4: 08

C. HAGER & SONS HINGE ]
MANUFACTURING COMPANY, ]
                       ]
    Plaintiff(s), ]
                  ]        CV-99-N-1663-E
    vs. ]
        ]
HOME INSURANCE COMPANY, et ]
al., ]
     ]
    Defendant(s). ]

**ENTERED**

DEC 0 7 2001

### Memorandum of Opinion

This is an action for declaratory judgment and breach of contract. The plaintiff, C. Hager Hinge & Sons, (hereinafter "Hager") seeks a declaration that the defendant insurers are required to defend and indemnify it for damages arising from trichloroethylene ("TCE") contamination at Hager's Oxford, Alabama, manufacturing plant.

The court has for consideration motions for summary judgment filed by defendants Home Insurance Company ("Home Insurance")(Doc. 103), United States Fire Insurance Company and Central National Insurance Company of Omaha ("United States Fire" and "Central National")(Doc. 114), and Northern Insurance Company of New York and Maryland Casualty Company ("Northern Insurance" and "Maryland Casualty")(Doc. 120). Hager has also filed a motion for partial summary judgment (Doc. 108) and defendants Home Insurance, Northern Insurance and Maryland Casualty have filed motions to strike. (Doc. 144, 152). The issues have been briefed by the parties and are now ripe for decision.



Upon due consideration:

1.    The motions to strike filed by Home Insurance and by Northern Insurance and Maryland Casualty (Doc. 144, 152) will be GRANTED IN PART and DENIED IN PART.

2.    Home Insurance's Motion for Summary Judgment (Doc. 103) will be GRANTED. Plaintiff's claims that Home Insurance is required to indemnify and defend Hager with respect to the TCE contamination at the Oxford site will be dismissed. Plaintiff's claim that Home Insurance breached its contract with Hager will be dismissed.

3.    United States Fire and Central National's Motion for Summary Judgment (Doc. 114) will be GRANTED. Plaintiff's claims that United States Fire and Central National are required to indemnify and defend Hager with respect to the TCE contamination at the Oxford site will be dismissed. Plaintiff's claim that United States Fire and Central National breached their contracts with Hager will be dismissed.

4.    Northern Insurance and Maryland Casualty's Motion for Summary Judgment (Doc. 120) will be GRANTED IN PART and DENIED IN PART. Plaintiff's claims for indemnification from Northern and Maryland under their primary and umbrella policies will be dismissed. The remainder of the motion will be denied.

5.    Hager's motion for partial summary judgment (Doc. 108) will be DENIED.

**I.    Motions to Strike.**

The motions to strike (Doc. 136, 137) will be denied insofar as they relate to the Dunn and Stallings declarations. The declarants' statements that they observed TCE spills in the degreaser pit do not contradict their deposition testimony that they did not personally

2

observe a TCE spill at the outside storage tank. A jury could reasonably conclude the declarants' statements that "[a]ll of these TCE spills and releases were completely unexpected and unintended" are consistent with the deposition testimony that periodic spills of TCE sludge occurred when 55 gallon drums were overfilled. Further, Fed. R. Evid. 701 specifically permits lay opinion testimony if those opinions are rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony. Rule 704(a) has abolished the prohibition on opinion testimony concerning the ultimate issue in a case. *Carter v. DecisionOne Corp. Through C.T. Corp. System,* 122 F.3d 997, 1005 (11th Cir. 1997).

The deposition testimony of Hager employees Dunn and Heneger regarding an alleged spill of TCE at the outside storage tank is due to be stricken. Dunn testified that he did not personally observe the spill, but that one of the other employees, perhaps Balkcom or Stallings told him about a spill. He also thought that the driver of the Ashland chemical truck might have told him about the spill. Heneger testified that Dunn told him about the spill. The defendants correctly observe that neither Dunn nor Heneger have personal knowledge about a spill at the outside tank, and their testimony about out of court statements offered to prove the occurrence of a spill at the outside tank is hearsay. Hager argues that the statements made to Dunn are admissible under the "excited utterance" or "present sense impression" exceptions to the hearsay rule. The court does not agree. There is not a sufficient showing of circumstances that produced a condition of excitement, nor is there a sufficient showing that the statements were made close to the time of the spill. Hager points to Dunn's testimony that he recalled "talking to Frankie or talking to the driver,

3

or talking to whoever-whoever it was at that time" as support for their claim that the statements were made at the time of the incident. The testimony is insufficient to establish a substantial contemporaneity between the statement and the event. Accordingly, the motion to strike the Dunn and Heneger testimony related to the spill at the outside storage tank will be granted.

The motions to strike will be granted in part and denied in part insofar as they relate to the reports and testimony of Hager's experts, Dr. Pat Cline and Dr. Ralph Ewers. The movants claim the reports are inadmissible because they are unsworn, but the reports were marked as exhibits at the experts' depositions and were affirmed by the deponents at that time. Hager has also submitted the experts' declarations which provide a foundation for the reports.

The movants also argue the experts' reports that the storage tank was a source of contamination at the site are not based upon facts or data of a type reasonably relied upon by experts in the field because the only "conceivable" support for their conclusion is the hearsay Dunn deposition testimony. Facts or data need not be admissible into evidence in order for an expert opinion or inference to be admitted. Fed. R. Evid. 703. Further, neither expert said they based their opinion solely on the hearsay testimony. Dr. Cline stated she relied on "numerous public documents, field reports, depositions, laboratory analytical data, and various memoranda that provide information on concentrations of chemicals in soil and groundwater at the Hager Hinge facility." (Cline Report, Maryland Ex. 7, Doc. 152). She stated that ". . . the TCE reported in groundwater migrating offsite at the Hagar Site was released from the degreasing pit and TCE tank storage area, consistent with

4

testimony that document spills that have occurred in these areas. . . ."  However, Dr. Cline went on to say, "In addition to review of the historical use of solvents in this area, this opinion is supported by soil borings and shallow groundwater concentrations measured at the site."  *Id.* at page 4.  Specifically with regard to the tank site, Dr. Cline stated that the TCE was present in the soil samples from that area.  *Id.*  Although Dr. Cline had access to the depositions and made reference to statements of spills in the same areas in which TCE was found in the soil, it is plain she primarily relied on the soil samples and other scientific data, and merely noted the consistency between her findings and the testimony.  There is no showing that Dr. Cline relied on facts or data of a type not reasonably relied upon by experts in the field, and this court is satisfied her methods were appropriate.

Dr. Ewers similarly relied on a variety of materials in making his report.  (Doc. 152, Ex. 8).  He did not affirmatively state that one spill occurred at the outside storage tank in his report.  Rather, he stated that "the groundwater contamination with TCE which has been documented there is consistent with such spills as their source."  *Id.*.  Contrary to movants' assertion, Dr. Ewers specified that he reviewed water samples taken beneath the Hager Hinge site in addition to the deposition testimony of the spills.  Again, there is no showing that Dr. Ewers relied on facts or data of a type not reasonably relied upon by experts in the field.  There is no requirement that an expert base his opinion on admissible evidence.  This court is satisfied Dr. Ewers' methodology was appropriate and his report is satisfactory.

However, to the extent portions of Dr. Ewers' deposition testimony can be construed as an affirmative  statement that a sudden, accidental spill occurred at the outside storage

5

tank, the court agrees that his opinion is without foundation. Unlike Dr. Cline, Dr. Ewers did not point to any evidence to support his opinion about the nature of the release other than the inadmissible Dunn and Heneger testimony. While an expert opinion need not be based on admissible evidence, Dr. Ewers' reliance on only the testimony to support this portion of his opinion is suspect. There is no showing that the opinion has a reliable basis in Dr. Ewers' discipline and that the reasoning and methodology underlying such an opinion is scientifically valid. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Further, an expert opinion based only on the Dunn and Heneger deposition testimony is irrelevant since it is unnecessary to assist the trier of fact in understanding this particular evidence. Accordingly, the motion to strike will be granted insofar as it relates to any testimony of Dr. Ewers' based solely on the deposition testimony of Dunn and Heneger regarding the type of release that occurred at the outside storage tank.

The experts were entitled to rely on the ECG report upon their conclusion that it was "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Both experts affirmatively so stated in their declarations, and this court finds no reason to disagree. However, the admission of the opinion or inference does not render the underlying information admissible. Accordingly, the ECG report is accepted only to the extent it assists in evaluation of the expert opinions.

Finally, Home Insurance has moved to strike plaintiff's interrogatory responses (Doc. 135, Hager Ex. P, S, and T)[1] because they are not made on personal knowledge. Hager

---

[1] The movants also argued Exhibit T was not properly verified. Hager has submitted evidence sufficiently establishing the exhibit was verified. (Hager Response Exhibit 8, Doc. 160).

relied on some of its own interrogatory responses in responding to the summary judgment motions. The responses were verified by Lawrence Burdt, Hager's chief financial officer, who stated that "some or all of the facts and matters set forth herein are not within his personal knowledge," that others assembled the facts, and that he was "informed" that the matters set forth were true. The officer or agent who signs interrogatories for a corporate party may disclaim personal knowledge of the facts, but acknowledge that the persons who provided the facts had stated them to be true. *Moore's Federal Practice*, § 33.104[2] (3d ed. 2000). Rule 56 provides that this court should consider interrogatory responses when deciding motions for summary judgment. Fed. R. Civ. P. 56(c). However, answers to interrogatories are subject to the Federal Rules of Evidence. *Moore's Federal Practice*, § 33.160 (3d ed. 2000). Answers to interrogatories that are not made on personal knowledge are merely hearsay, and are not admissible unless an exception applies. The typical exception, the statement of a party opponent exception of Fed. R. Evid. 801(d)(2), is not applicable when the party seeks to introduce its own answers into evidence. Accordingly, Hager's interrogatory answers will not be considered in these summary judgment proceedings.

**II.     Statement of Facts**.

Plaintiff Hager Hinge opened a manufacturing and production facility in Oxford, Alabama, in approximately 1978.[2]  The manufacturing and production processes at the

---

[2] The background information set out here was taken from the Home Insurance Company and other defendant's Statement of Facts which were undisputed by Hager (Doc. 104, 129) and from the court's review of the record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

Oxford site included a hinge degreasing operation using the chemical trichloroethylene ("TCE").

The equipment used as part of the degreasing operation included an above-ground storage tank, which was located outside of Hager's Oxford facility.  TCE was delivered to the site by truck and loaded into the storage tank, which held approximately 2000 gallons of TCE.  Hager kept 1000 gallons of TCE in the outside storage tank, ordering additional TCE to refill it about once a month.

The degreasing operation also included a TCE degreasing tank, distillation unit, and affiliated pumping and piping equipment, all of which was located inside Hager's facility.  The degreasing tank was a stainless steel metal tank, approximately 6' x 10', which held approximately 400 gallons of TCE.  Hager did not have a steel cover on the tank.  Instead, it kept the tank open, except a canvas cover was placed over the top of the tank when the system was shut down at night.  The TCE degreasing tank was situated over a concrete pit in the floor that was approximately 12' deep and several feet wide.  TCE in the degreasing tank was converted from liquid to vapor by heating coils.  The heated TCE would vaporize and rise in the degreasing tank to envelope baskets of hinges that were lowered into the tank.  Refrigerated coils ran around the perimeter of the vat.  When the vapor rose to the cold coils, the cold phase caused the vapors to condense, and drop downward.  While the heating and refrigeration elements were in operation there would be a zone of vapor between the top of the liquid and the bottom of the refrigerated coils.  The oily parts would be placed in a basket that would hang in the vapor phase and the vapor TCE would remove

8

the oil from the metal parts. After it was cooled, the liquid TCE and oil residue from the hinges would settle back into the bottom of the degreasing tank.

The used TCE was then pumped from the degreasing tank into a distillation unit or "still" which would separate the TCE from oil residues so the TCE could be re-used in the degreasing tank.[3] TCE sludge was pumped from the distillation unit through a hose into 55 gallon drums located in the concrete pit below the degreasing tank. After the 55 gallon drums were filled, they were lifted out of the pit with a crane and stored until removed for disposal by an outside company.

Employees in the Plating Department of Hager's Oxford facility were responsible for operation of the TCE degreasing equipment. Ruel ("R. L.") Dunn, supervisor of the Plating Department, testified that "maybe two or three times a year" a drum would be overfilled and would overflow into the pit. (Doc. 106, Home Ins. Ex. 11, p. 33-34, 56, 75-76, 222). Frank Stallings, a plating operator working under Dunn's supervision, testified spills occurred around the tank once or twice a month, either from drums overflowing or leaks from the pipe or seals in the pump. (Doc. 106, Ex. 16, p. 61-62, 75-76, 80, 221-224, 260, 273-75). Stallings stated that each overflow would be about three to four gallons of sludge. (Doc. 135, Ex. J, p. 79-80). Clarence Balkcom testified spills occurred two to three times per year. (Doc. 106, Ex. 12, p. 25). Dunn testified that a sump pump located in the bottom of the pit would automatically pump spilled sludge back into the still. (Doc. 113, Ex. 17, p. 78-79).

---

[3]The parties dispute the amount of TCE residue that remained in the sludge after the refined TCE was removed, but it is undisputed that the sludge included some amount of TCE. Hager submitted evidence that a poorly operated distillation unit might leave as much as five percent TCE in the waste, but in no case more than ten percent. (Doc. 135, Ex. K). Tom Dillard, Hager's Environmental Coordinator, testified that the waste profile for TCE "still bottoms" varied. (Doc. 135, Ex. D). Dr. Cline and Dr. Ewers testified they did not know the composition of the sludges. (Doc. 135; Ex. U, p. 112-13; Ex. V, p. 171-73).

Stallings testified the employees had to lower a submersible pump into the pit to clean up spills. (Doc. 135, Ex. J, p. 87-89).

Dr. Patricia Cline, a senior scientist with Golder Associates, Inc. who holds a Ph. D. in Environmental Chemistry reported the focus of her analysis was the distribution of solvents to establish where and when TCE was released and the groundwater contamination occurred. (Doc. 135, Ex. E). She opined that the TCE in the groundwater was released from the degreasing pit and TCE tank storage area, consistent with testimony that spills have occurred in these areas. *Id.* Dr. Cline testified that the distribution of TCE at the Hagar Hinge site was consistent with multiple or repeated releases rather than one massive spill. (Doc. 106, Ex. 19, p. 55-59). She testified:

> . . . a single massive spill, especially of the kind of quantity that you indicate in the remediation report, would have spread laterally, significantly laterally. There is a significant vertical distribution, meaning there was time for the material to soak in and move downward allowing another spill to actually then contribute to that in a more vertical fashion.

(Doc. 113, Ex. 11, p. 73). Dr. Cline could not estimate the frequency or volume of the spills. *Id.* at 60-61.

Dr. Ralph Ewers, a Professor of Geology at Eastern Kentucky University and a senior hydrogeologist and president of Ewers Water Consultants, Inc., reported that he reviewed analyses of water samples and deposition testimony regarding spills near the degreasing operation and outside storage tank and concluded the documented TCE groundwater contamination was consistent with "such spills as their source." (Doc. 135, Ex. F). He testified the maps purporting to show the distribution of TCE in the soil were consistent with the reported locations as their source. (Doc. 106, Ex. 20, p. 96-97).

10

In approximately 1988, Hager's Chief Operating Officer ordered all of his plant managers to "get rid of" their TCE degreasing systems within one year.  In approximately mid-1989, Hager stopped using TCE at Oxford.  In 1990, Hager disposed of TCE waste material remaining at its Oxford facility, unused TCE from its outside storage tank, the outside storage tank, and the degreasing equipment inside.  The pit located under the degreasing tank was filled with concrete.

In February 1993, a site assessment by Law Engineering revealed the presence of TCE in the groundwater and subsurface soils at the Oxford site.[4]  At or shortly after the Law Engineering assessment, persons at Hager became aware of the TCE contamination.[5]  In May 1993, Hager retained ECG, Incorporated - Engineering and Environmental Services to investigate the TCE contamination.[6]  During the next several months, ECG reported to Hager that its investigation revealed "a major soil and groundwater contamination problem" at the Oxford site.

In March 1994, a written report regarding the results of ECG's investigation was submitted, on behalf of Hager, to the Alabama Department of Environmental Management (ADEM).  On March 7, 1994, several representatives of Hager, including its Chief Operating Officer and Executive Vice President, Plant Manager, and Environmental Coordinator, met with ADEM to discuss the Oxford TCE contamination.  On April 7, 1994, Hager received a

---

[4] Hager disputed this statement, but did not point to any contrary evidence of record other than its own answers to interrogatories.  *See* Home's Statement of Facts (Doc. 104) and Hager's Response (Doc. 129).

[5] Hager disputed this statement, but did not point to any contrary evidence of record other than its own answers to interrogatories.  *See* Home's Statement of Facts (Doc. 104) and Hager's Response (Doc. 129).

[6] Hager disputed this statement, but did not point to any contrary evidence of record other than its own answers to interrogatories.  *See* Home's Statement of Facts (Doc. 104) and Hager's Response (Doc. 129).

11

Notice of Violation from ADEM requiring that it conduct a groundwater quality assessment to determine the extent of the TCE contamination. Hager directed ECG to perform the assessment and the results were reported to ADEM on May 20, 1994. On December 21, 1994, ADEM provided Hager with its comments on the Groundwater Assessment Plan indicating that further investigation was necessary to identify the full extent of the TCE contamination. During the following year, ECG submitted to ADEM, on behalf of Hager, plans for additional investigation and assessment of the TCE contamination. The plans were approved by ADEM. On January 16, 1996, a second meeting took place between representatives of Hager and ADEM, after which ECG began the process of selecting a remedial technology to address the TCE contamination. By December 1996, ECG was arranging for installation of a Multi-Phase Vacuum Extraction (MPVE) system to remove the TCE from the soil and groundwater. On January 26, 1999, in its "Annual Remediation Progress Report," ECG reported over 289 million cubic feet of air had been exhausted and approximately 2392 pounds of vapor phase TCE had been removed. Over 516,230 gallons of contaminated groundwater had been extracted and 1380 pounds of TCE in the dissolved phase had been removed. The total TCE removed by that date was 3780 pounds. In 1997, further assessments and plans were submitted to ADEM on behalf of Hager in an attempt to define the extent of the TCE contamination. In 1998, a Dye Tracer Investigation study was performed by ECG for the purpose of determining the extent of groundwater contamination at Hager's Oxford facility. By the end of 1998, Hager retained CH2M Hill, a second engineering/consulting firm, to assist in the groundwater assessment. In 1999, CH2M Hill took over the project of assessing the TCE contamination. As of October 2000, CH2M Hill

was uncertain regarding the nature, and extent of Hager's future plans to remediate the TCE contamination at the Oxford site.  Dr. Cline testified that the total amount of TCE removed from the subsurface through December of 1998 was approximately 3780 pounds.  (Cline Depo., Doc. 106, Ex.19, p. 65-66).  This represents about 310 gallons of TCE.  (Doc. 135, Ex. Y, p.7).

On May 24, 1999, Hager filed suit against the insurers in the Circuit Court for Calhoun County, Alabama, and the case was removed on the basis of diversity jurisdiction to this court.  The insurers contend they first received notice regarding their potential liability for property damage about the time Hager filed suit in May 1999.  Hager contends it provided notice to its insurers in 1993 or 1994, by telephoning Curt Engler, who it claims is the insurer's agent.

## III.    Standard of Review.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing that there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**IV.    The Motions for Summary Judgment.**

The insurers argue that Missouri law governs the contracts of insurance they issued to Hager and that there is no coverage under Missouri law for Hager's releases of pollution

at the Oxford facility because the releases were not "sudden and accidental."[7] In the alternative, and without waiving their position that Missouri substantive law applies to the insurance contracts at issue, the insurers argue the timing of Hager's notice to them was unreasonable as a matter of Alabama law. The insurers further argue they are entitled to summary judgment as to the breach of contract claims because they did not receive notice of the claim until they were served the complaint in the present litigation. Home Insurance separately argues it is entitled to summary judgment on all claims involving a duty to defend because there are no lawsuits to defend.

### 1.    Choice of Law.

A federal court exercising its diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). The general choice of law rule for contracts in Alabama is *lex loci contractus*, which provides "the law of the state wherein the contract was executed governs questions regarding the validity and interpretation of the contract." *American Nonwovens, Inc. v. Non Wovens Engineering, S.R.L.*, 648 So. 2d 565, 567 (Ala. 1994). In the context of insurance, the policy should be construed by the law of the state where the last act necessary to make the contract took place. *American Motorist Ins. Co. v. Southern Security Life Ins. Co.*, 80 F. Supp. 2d 1280, 1282 (M.D. Ala. 2000). The last necessary act to form an insurance contract is generally the receipt and acceptance of the policy by the named policyholder. *Industrial*

---

[7]Alabama and Missouri law differ on this point. In *Alabama Plating Co. v. United States Fid. and Guar. Co.*, 690 So. 2d 331 (Ala. 1996), the court held that the term "sudden" is ambiguous, and, therefore, coverage exists for release of contaminants into the environment if unexpected and unintended.

*Chem. & Fiberglass v. North River Ins. Co.*, 908 F.2d 825, 829 n. 3 (11th Cir. 1990);

*American Motorists Ins. Co.*, 80 F. Supp. 2d at 1282; *Brown Machine Works v. Ins. Co. of

North America*, 951 F. Supp. 988, 992 (M.D. Ala. 1996). The parties agree that the insurance

agent that issued the policies was located in St. Louis, Missouri, and Hager's principal

corporate office, which had responsibility for obtaining the insurance contracts was located

in Missouri. The policies were delivered to Hager Hinge at its corporate offices in St. Louis.

There is no evidence that any significant event related to the receipt and acceptance of the

policy took place in Alabama. Thus, application of the *lex loci contractus* rule dictates that

Missouri law applies to the contract claims at issue in this case.

Hager argues this court should find an exception to the *lex loci contractus* rule

based on Alabama's significant interest in litigation involving insurance of risks permanently

located in Alabama, citing *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116 (11th Cir.

1990)(concluding Florida would not adhere to *lex loci contractus* rule where Florida had

applied Restatement principles to conflict of laws questions involving other areas of the law,

such as torts). However, Alabama has unwaveringly applied the *lex loci contractus* rule.

*See Cherry Bekaert & Holland v. Brown*, 582 So. 2d 502 (Ala. 1991)(applying *lex loci

contractus* rule to conclude Alabama law applied, even where parties had agreed to law

of another jurisdiction since parties' choice of law was contrary to the fundamental public

policies of Alabama). This court should not reinterpret Alabama's choice of law theories

without a clear directive from its courts. *Morris v. SSE, Inc.*, 912 F.2d 21392, 1396 (11th Cir.

1990).

Accordingly, Missouri law governs the insurance contracts at issue in this action.

16

### 2.    The Pollution Exclusion.

The policies issued to Hager Hinge provided that coverage was excluded for liability

arising out of:

> the discharge, dispersal, release or escape of smoke, vapors, soot, fumes,
> acids, alkalis, toxic chemicals, liquids or gases, waste materials or other
> irritants, contaminants or pollutants into or upon land, the atmosphere or any
> water course or body of water; but this exclusion does not apply if such
> discharge, dispersal, release or escape is sudden and accidental.

(Central National and United States' Fire Ex. 6 through 8;  Home Insurance Ex. 3 through

6;  Northern Insurance and Maryland Casualty Ex. 3 through 8).  Hager agrees that all of

the alleged damage arises from the release or discharge of TCE, a hazardous chlorinated

solvent, into the environment.  Accordingly, Hager's claims fall  within the general scope

of the pollution exclusion.

However, an exception to the exclusion provides for coverage if the release of

pollutants was "sudden and accidental."  The meaning of the "sudden and accidental"

exception is unsettled, with many jurisdictions finding the phrase to be ambiguous.

In *Aetna Cas. & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707 (8th Cir. 1992) and

*Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919 (8th Cir. 1998), the Eighth Circuit

predicted the meaning of the "sudden and accidental" exception to the pollution exclusion

under Missouri law and concluded that Missouri would find the phrase to unambiguously

require the insured to prove that contamination was caused by a sudden and accidental

release of pollutants.  Hager argues the Eighth Circuit decisions are incorrect expressions

of Missouri law because Missouri would not place the burden of proving the exception to

the exclusion on the insured and would find the phrase "sudden and accidental" to be ambiguous.

In *FAG Bearings*, the Eighth Circuit placed the burden of proving the discharge was sudden and accidental squarely on the insured. *FAG Bearings*, 153 F.3d at 923 (Insured FAG has failed to put forward sufficient evidence to create a genuine issue of material fact as to whether such releases were "sudden and accidental"). Hager argues the insurers should have the burden of proving the claim is not subject to the "sudden and accidental" exception to the exclusion, *citing Superior Equipment Co., Inc. v. Maryland Casualty Co.*, 986 S.W. 2d 477, 482 (Mo. Ct. App. 1998). This court finds *Superior Equipment* inapposite. In that case, the court observed the burden is on an insurance company to establish the applicability of an exclusion to coverage. *Id.* However, it did not discuss the burden of proof for an exception to the exclusion. Rather, in response to the insurers' argument that there were no "sudden and accidental" releases during the policy periods, the court concluded the insured had not had sufficient opportunity to discover all the facts where discovery had been stayed in the underlying lawsuit. *Id.* Hager also relies on *American Family Mut. Ins. Co. v. Bramlett*, 31 S.W.3d 1 (Mo. Ct. App. 2000), in which the court required the insurer to prove application of a business pursuits exclusion. *Id.* at 6. The language of the particular exclusion at issue provided that an injury resulting from the business of operating a day care center in the home was excluded from coverage, but injury resulting from an incident unrelated to business was covered under the exception to the exclusion. The decision is not inconsistent with *FAG Bearings* since the particular exclusion and exception at issue in *Bramlett* were exact opposites of each other so that to

18

prove the exclusion automatically disproved the exception, and vice versa.  In contrast, to establish the application of the exception to the pollution exclusion requires separate proof that a discharge was "sudden and accidental."  Since the *Bramlett* court did not say it was adopting a general rule applicable to all exceptions to exclusions, and the language of the exception at issue in that case was materially different from the language at issue in this case, this court finds no reason to conclude the *FAG Bearings* decision is compromised by *Bramlett*.  Accordingly, this court agrees with the *FAG Bearings* court that the burden of proving the release of pollutants was "sudden and accidental" is on the insured. *And see Trans World Airlines v. Associated Aviation Underwriters*, 2001 WL 909018 (Mo. App. Aug. 14, 2001)(insured bears burden of proving "sudden and accidental" exception to pollution exclusion), *affirming* No. 942-01848A, Missouri Circuit Court (December 21, 1998)(Mealey's Litigation Report, Volume 13, #10, 1/12/99)(Included in Doc. 148, Ex. 6).

The *FAG Bearings* court reiterated its earlier conclusion in *General Dynamics* that the "sudden and accidental" exclusion is unambiguous under Missouri law and the term "sudden" connotes an unexpected event that does not occur continuously over a significant period of time.  The court rejected the contention that the "sudden and accidental" terms should be interpreted to mean "unexpected" and "unintentional," stating:

> Missouri law requires all terms of an insurance contract to be given meaning and since accidental includes the unexpected, the term sudden cannot be given a contradictory meaning that would render the term accidental meaningless.  In other words, the term "sudden" must include a temporal element such that it is abrupt, immediate and unexpected.

*FAG*, 153 F.3d at 923. The *FAG Bearings* court said "accidental" means that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and

unforeseen. *FAG Bearings*, 968 F.2d at 710. Hager argues Missouri would follow some other jurisdictions, including Alabama, and conclude the "sudden and accidental" exception is ambiguous and must be construed against the insurer. However, other courts predicting Missouri law have reached conclusions consistent with *FAG Bearings* and *General Dynamics*. *See, e.g. Charter Oil Co. v. American Employers' Ins. Co.*, 69 F.3d 1160 (D.C.Cir. 1995)(following *General Dynamics* and concluding "sudden" means abrupt); *Independent Petrochemical Corp. v. Aetna Cas. and Sur.*, 842 F. Supp. 575 (D.D.C. 1994)(same); *Trico Ind., Inc. v. Travelers Indemn. Co.*, 853 F. Supp. 1190, 1194 (C.D. Cal. 1994)(recognizing split of authority on point but concluding *General Dynamics* is persuasive as to Missouri law so that word "sudden" is unambiguous in the context of the policy exclusion and includes a temporal element). Further, the lower and intermediate Missouri courts have construed the provision consistently with the *FAG Bearings* court. *See Trans World Airlines v. Associated Aviation Underwriters*, 2001 WL 909018 at *5 (Missouri state court ruled pollution exclusion is unambiguous, and that is incompatible with gradual occurrences). After reviewing the parties' briefs and arguments and the opinions of the other courts addressing this issue, this court is satisfied that *General Dynamics* and *FAG Bearings* are correct explications of Missouri law.

Accordingly, Hager has the ultimate burden of proving the contamination at its Oxford, Alabama, site is the result of an abrupt, immediate, unintentional and unexpected release of TCE. In these summary judgment motions, the defendants claim Hager cannot meet that burden and Hager must, therefore, make a showing sufficient to establish there is a genuine dispute of fact regarding the nature of the discharge that led to the

20

contamination at Oxford. *Celotex*, 477 U.S. at 322; *Liberty Lobby*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. Hager argues the record includes sufficient evidence to create a question for the factfinder regarding whether any spills at the Oxford plant were "sudden and accidental."

### a.   The Outside Storage Tank.

There is no admissible evidence from which a jury could reasonably determine how the TCE got into the soil beneath the storage tank.  The Dunn and Heneger testimony of a spill when the Ashland oil truck was filling the tank is mere hearsay.  Although the experts identified the storage tank as a source of contamination, their reports do not establish the TCE was released into the soil under the tank suddenly and accidentally.  Hager has the burden of proof on this issue, as discussed above, and has not pointed to any other evidence to support its claim that the contamination below the tank was the result of a sudden and accidental spill.

### b.   The Degreasing Area and the Pit.

Hager argues there is a question of material fact regarding whether the releases in the pit were sudden, pointing to the declarations of Stallings and Dunn that each spill at the site was quick and abrupt.  Hager also argues it does not have to show a causal link between a particular "sudden and accidental" spill and 100% of the contamination found in the environment. As discussed above, Hager has the burden of proving the contamination at the site was caused by a "sudden and accidental" release of pollutants.  In this context, the term "sudden" has a temporal quality and connotes an abrupt, immediate and unexpected event. *FAG Bearings*, 153 F.3d at 923.  Hager has not pointed to any authority supporting its implied argument that this court should separately examine each spill in determining whether it has met its burden of proving the contamination was caused by a sudden release of TCE.  There is considerable support for the proposition that the court should look at the overall pattern when multiple discharges are ongoing for long periods

22

of time. *See e.g., Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 195-96 (5th Cir. 1998) (Texas law) (seventy-seven spills at nineteen facilities over period of forty years, including multiple still boil-overs, small spills changing filter cartridges, spills from failed filter gaskets, spills while cleaning up machines, were in routine course of business even though minor accidents or isolated spills occurred during same period); *Charter Oil Co. v. American Employers' Ins. Co.*, 69 F.3d 1160, 1170 (D. C. Cir. 1995) (Missouri law) (individual spraying sessions occurring over a period of two months not sudden and accidental viewed in aggregate); *Quaker State Minit-Lube v. Fireman's Funds Ins.*, 52 F.3d 1522, 1529 (10th Cir. 1995) (Utah law) (overall pattern of discharges was not sudden and accidental even though  individual discharges viewed in isolation appear sudden and accidental, courts should not engage in microanalysis of discrete discharges when the discharges otherwise arise as commonplace events which occur in the course of daily business); *Cincinnati Ins. Co. v. Flanders Electric Motor Service, Inc.*, 40 F.3d 146, 154 (7th Cir. 1994) (Indiana law) (releases of PCB's which were commonplace events occurring in the course of business cannot be considered sudden and accidental even where one or more of the spills may have occurred suddenly and accidentally);  *Bureau of Engraving, Inc. v. Federal Ins. Co.*, 5 F.3d 1175, 1177 (8th Cir. 1993) (Minnesota law) ("discharge by discharge" inquiry would render all releases sudden and exception would swallow rule); *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1438 (9th Cir. 1993) (California law) (non-sudden, continuous pollution does not qualify as an exception to the pollution exclusion); *U. S. Fidelity & Guar. Co. v. Morrison Grain Co., Inc.*, 999 F.2d 489, 493 (10th Cir. 1993) (Kansas law) (discharge was not sudden and accidental but a gradual dispersal or release of toxic

chemicals or waste materials); *A. Johnson & Co., Inc. v. Aetna Cas. & Sur. Co.*, 933 F.2d 66, 75 n. 14 (1st Cir. 1991)(Maine law)(contamination of site which arose due to continuing waste disposal practices over a long period of time and as a concomitant of regular business activity fell squarely within the pollution exclusion and was not sudden and accidental); *U.S. Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 35 (6th Cir. 1988)(Kentucky law)(such pollution exclusion clauses apply to the release of wastes and pollutants taking place on a regular basis or in the ordinary course of business); *Great Lakes Container Corp. v. National Union Fire Ins. Co.*, 727 F.2d 30, 33 (1st Cir. 1984)(New Hampshire law)(discharge was not sudden and accidental where pollution occurred as a concomitant of regular business activity). *And see Trans World Airlines*, Doc. 148, Ex. 6, at p. 12 (one or more sudden and accidental spills or leaks in the course of the insured's disposal operations does not render all of insured's usual disposal activities sudden and accidental).

Hager argues there is a dispute of fact regarding the number of TCE releases at the site and that a jury must decide if, when, and how many releases occurred. However, the exact number of releases is immaterial since, based on the evidence of record, the jury must conclude there were repeated spills at the site rather than a single sudden and accidental release of TCE. Dunn and Balkcom testified to spills two to three times a year, which would amount to approximately 20 to 30 spills in the ten years Hager used TCE at the site. Stallings testified there were TCE spills around the tank two to three times per month, either from leaks in the pipes or drum overfills, which would amount to approximately 240 to 360 spills in the same period. Dr. Ewers testified the contamination was consistent with

the testimony and Dr. Cline unequivocally testified the pattern of TCE contamination resulted from multiple spills.  These spills could not be "sudden and accidental" under Missouri law.  The term "sudden" includes a temporal element and means "abrupt" or "immediate."  *FAG Bearings*, 968 F.2d at 710.  While the deponents had differing recollections of how many spills occurred on average, it is undisputed that there were multiple spills in the pit.

In its responses to defendants' statements of facts, Hager relies on Heneger's testimony that he observed only one spill in the pit.  However, unlike Dunn, Balkcom and Stallings, who testified they worked in the degreasing area and filled the drums,[8] Heneger testified he was the maintenance supervisor (Doc. 135, Ex. I, p. 26) and there is no showing he was typically present in the pit area.  That Heneger saw only one release of sludge in the pit does not tend to prove there was only one release unless there is a correlative showing Heneger had opportunity to consistently observe the activity in the degreasing area.  Indeed, Heneger did not attempt to establish the frequency of sludge spills or disprove the possibility of other spills, since he only stated:

> . . . They were filling a fifty-five gallon drum and they overfilled it. . . . Just that one time as far as I - - - I didn't see any more, you know.  So, that's the only time I ever observed was the one time and that was it.

(Doc. 135, Ex. I, p. 20-21).  The probative value of the proof offered is properly considered on a motion for summary judgment.  *Anderson*, 477 U.S. at 249-50; *Chapman v. Al Trans.*,

---

[8]Dunn testified that he, Stallings and Balkcom filled the drums (Doc. 113, Ex. 17, p. 231-32).  Stallings testified that he worked in the plating department with Dunn and Balkcom, and that he observed filling of the drums.  (Doc. 113, Ex. 19, p. 33-35, 69-70, 75-80).  Balkcom testified he, Stallings and Dunn were in the plating department.  (Doc. 113, Ex. 20, p. 10-11, 20).

229 F.3d 1012, 1024 n. 11 (11th Cir. 2000). A reasonable jury could not conclude there was only one release of sludge in the pit based solely on Heneger's testimony, particularly in view of the contrary testimony from Dunn, Balkcom and Stallings. The great weight of the evidence shows that there were repeated small spills of oil sludge in the pit.

Similarly, while Dunn testified to a release of vapor from the degreasing vat that could, in itself, be considered "sudden and accidental," the evidence of one release of TCE vapor from the vapor degreaser does not change the fact that the pollution of the site was gradual rather than sudden.[9] There is no way to distinguish the damage caused by one single release from the damage caused by any other release of TCE.

Hager argues the evidence shows the releases were "unexpected and unintended," and that it took reasonable steps to prevent and contain releases. While this evidence creates a jury question regarding the accidental nature of the releases, as noted above, Missouri also requires the insured to present evidence from which a jury could conclude the contamination was caused by a sudden, or "quick and abrupt," release.

Hager has not met its burden in this summary judgment proceeding of presenting sufficient evidence from which a jury could reasonably conclude that the contamination at the Oxford site was the result of a sudden and accidental release of TCE. Accordingly, the

---

[9]The court also notes Hager has not been able to present any evidence regarding the date the vapor release occurred because it did not keep records of spills. If this court determined the vapor release should be treated separately from the other spills, and that there was a jury question regarding the sudden and accidental nature of the release, Hager would not be able to establish that the release occurred during any particular insurer's policy period. Maryland Insurance, for example, points out that its policies were terminated on January 1, 1986, but the evidence establishes Hager used TCE until 1989.

defendants' motion for summary judgment as to Hager's claims for indemnity are due to be granted.[10]

### 3. The Notice.

Hager has moved for partial summary judgment as to the insurer's late notice defense, arguing that the defendants cannot show they were actually prejudiced by any late notice as required by Missouri law.  In their reply briefs and in their responses to Hager's motion, the insurers argue they were prejudiced by the six year delay, and that they are entitled to summary judgment under Missouri law.

The insurers claim Hager delayed giving notice for six years and thereby breached the notice condition in the policies as a matter of Alabama law.[11]  Hager responds that it provided sufficient notice of its claim via a phone call from Larry Burdt to Curt Engler in 1993.

As discussed above, this court has concluded that the insurance policies at issue are governed by Missouri law.  Under Missouri law the insurers must show they were prejudiced by late notice, except, at least as to the duty to defend, prejudice is presumed when notice is provided so late that the insurer is denied an opportunity to defend the claims against the insured. *Trans World Airlines, Inc. v. Associated Aviation Underwriters*,

---

[10] The insurers did not argue for summary judgment as to their duty to defend.  The duty to defend is broader than the duty to indemnify. *McCormack Baron Mgmt. v. American Guarantee & Liability Ins. Co.*, 989 S.W.2d 168, 170 (Mo. 1999).  Each duty requires a separate analysis. *Id.*

[11] The insurers raised this argument as an alternative to their claim that Hager could not meet its burden of proving under Missouri law that the contamination at the Oxford site was caused by a sudden and accidental spill.

2001 WL 909018, *7 (Mo. App. Aug. 2001), *citing Rocha v. Metro. Property and Cas. Ins.*, 14 S.W.3d 242, 248 (Mo. App. 2000).

Home Insurance, Central National and United States Fire also argue they are entitled to summary judgment on Hager's breach of contract claims due to the late notice.

### a.    **Actual Prejudice.**

In determining whether an insured was in substantial compliance with a policy's notice provision, the trier of fact must consider whether the insurance company was prejudiced by the delay. *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7, 15 (Mo. 1995). The burden of proving such prejudice is on the insurer and the presence or absence of prejudice in this context is an issue of fact to be determined on the particular facts of each case. *Id.* at 16. If the insurer can prove to the trier of fact that it was prejudiced by the late notice, the analysis ends and the insurer is entitled to judgment in its favor. *Id.* Prejudice is not presumed from mere delay in giving notice, and the insurer must establish that it was prejudiced in that it could not adequately investigate or defend the claim. *Reid v. Connecticut General Life Ins. Co.*, 17 F.3d 1092, 1098 (8th Cir. 1994). The insured must give notice of the complaint or pleading which would invoke the duty to defend. *Trans World Airlines*, 2001 WL 909018 at *7.

The insurers have pointed to evidence that: (1) the MPVE system utilized by Hager to remove TCE from the soil and groundwater has disturbed the area, so that the experts could not obtain groundwater data below the degreaser area;  (2) a 1999 water main break spread the TCE contamination at the site;  (3) witnesses' memories have faded over time;  (4) they lost an opportunity to pursue claims against an alternative possible polluter,

28

Ashland Chemical Company;  (5) there was a "done deal" between Hager and the ADEM without input from the insurers;  (6) the degreasing equipment had been removed and the pit filled with cement.[12]

Hager argues the insurers must establish specific actual prejudice by showing what information is available now and what information would have been available had notice been made 'as soon as reasonably possible,' citing *Weaver v. State Farm Mut. Auto. Ins. Co.*, 936 S.W.2d 820, 822 (Mo. 1997) and *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7 (Mo. 1995). The insurer's burden in responding to a motion for summary judgment is not so onerous. Although the insurers have the ultimate burden of proving their affirmative defense of late notice, in responding to Hager's summary judgment motion they need only point to sufficient evidence of record from which a reasonable factfinder could find prejudice. The cases are not to the contrary. In *Tresner* and *Weaver*, the Missouri Supreme Court was reviewing a grant of summary judgement in favor of the insurer and found the evidence was insufficient to entitle them to judgment as a matter of law. Neither court indicated the insured was entitled to summary judgment in the circumstances. Neither do any of the intermediate appellate cases cited by Hager support its claim that it is entitled to judgment as a matter of law if the insurers do not present evidence of actual prejudice. *See Farm Bureau Town and Country Ins. Co. v. Rogers*, 959 S.W.2d 880, 885 (Mo. Ct. App. 1997) (in view of evidence that the deceased insured was not a witness to the accident at issue and the insurer had not attempted any investigation after receipt of notice,

---

[12] Hager argues this evidence should not be considered because the defendants failed to include it in their responses to Hager's answers to interrogatories or in 30(b)(6) testimony. The evidence is indisputably part of the evidentiary record and there is no evidence that Hager was surprised or prejudiced. In these circumstances, the court will not entertain Hager's invitation to strike the evidence as a form of discovery sanction.

the trial court's finding after bench trial that the insurer failed to demonstrate prejudice was supported by the evidence); *Brown Group, Inc. v. George F. Brown & Sons, Inc.*, 963 S.W.2d 286 (Mo. Ct. App. 1997) (summary judgment for insurance broker is reversed and case remanded notwithstanding broker's alternative argument that summary judgment could be upheld on late notice defense; trial court correctly concluded broker was not entitled to summary judgment on late notice defense where it failed to present facts sufficient to prove it was prejudiced); *Katz Drug Co. v. Commercial Standard Ins. Co.*, 647 S.W.2d 831, 836 (Mo. Ct. App. 1983) (reversing trial court finding that insurer was not liable, appellate court found insurer was liable for damages resulting from error but not from intentional act of insured; insurer was not prejudiced by late notice in view of limitation of recovery to costs of correcting error, which was only possible reduction of insurer's liability regardless of notification date). *And see Reid v. Connecticut General Life Ins. Co.*, 17 F.3d 1092 (8th Cir. 1994) (trial court finding of prejudice after bench trial was not clearly erroneous), *Ralston Purina Co. v. Home Ins. Co.*, 760 F.2d 897 (8th Cir. 1985) (evidence was sufficient for jury determination on whether insurer was prejudiced). *And see Greer v. Zurich Ins. Co.*, 441 S.W.2d 15, 32 (Mo. 1969) (upholding trial court's finding that insurer had been prejudiced based on testimony describing preliminary investigation typical in such cases, selection of trial counsel and possibility of settlement prior to trial). The evidence would be sufficient for a reasonable factfinder to conclude that the insurers were unable to conduct an effective investigation to determine how and when TCE was discharged into the environment at the Oxford site and that they were, therefore, prejudiced by the late notice. Accordingly, Hager's motion for summary judgment will be denied.

Summary judgment for the insurer is appropriate in the limited circumstances described in *Trans World Airlines*, 2001 WL 909018 at *10. In *Trans World Airlines*, the Missouri Court of Appeals affirmed the granting of summary judgment for insurers where the insured never made a claim for defense or indemnity prior to bringing suit, which was filed long after it had settled with the EPA and committed itself to many corrective measures. *Id.* The *Trans World* court followed a line of Missouri cases which held, in the context of a lawsuit, an insurer was relieved from liability under a policy where the insured did not notify it of suit. *Rocha v. Metropolitan Prop. and Casualty Ins.*, 14 S.W.3d 242, 247-48 (Mo. App. 2000)(presumption of prejudice to insurer where there is an unexcused failure of insured to forward suit papers which denies the insurer the opportunity to defend); *Dickman Aviation Serv., Inc. v. U.S. Fire Ins. Co.*, 809 S.W.2d 149, 150 (Mo. App. 1991)(insurer was presumptively prejudiced where insured did not notify insurer until after trial and entry of judgment);  *Anderson v. Slayton*, 662 S.W.2d 575 (Mo. App. 1983); *Hawkeye-Security Ins. Co. v. Iowa Mut. Ins. Co.*, 567 S.W.2d 719 (Mo. App. 1978)(waiver of claim to defense where insurer was not notified of claim or suit);  *but see Palmer v. Hawkeye Security Ins. Co.*, 1 S.W.3d 591 (Mo. App. 1999)(insurer not presumptively prejudiced where notice was received before entry of default judgment became final).

Thus, the cases indicate the Missouri courts will presume prejudice when the insurer is not given notice of its duty to defend in time to give it an opportunity to defend. In *Trans World Airlines*, the court found the insurer was prejudiced because TWA had settled with the EPA and committed itself to many corrective measures. Hager claims in brief that it has not entered into any final agreements with ADEM concerning the site. Nevertheless, it has

31

conducted extensive negotiations with ADEM and has undertaken significant remediation of the Oxford site. In these circumstances, this court is satisfied that the insurers who did not receive notice are presumptively prejudiced, at least with respect to their duty to defend.

### b.     Notice.

In response to the insurers' claim that they did not receive notice of the contamination at the Oxford site until suit was filed in the Circuit Court for Calhoun County on May 24, 1999, Hager points to Larry Burdt's testimony that he spoke with Curt Engler about the TCE contamination at Oxford in 1993 and that Engler told him Hager did not have coverage.[13] (Doc. 135, Ex. C, p. 25-28; Doc. 106, Ex. 7, p. 31, 47-48, 50). Hager argues Engler was the insurers' agent and that it relied on Enger's representation that the policies did not cover the contamination.

The law imputes to the insurance company any knowledge of its agent acting within the scope of his authority. *Watkins v. Prudential Ins. Co. of America*, 151 S.W.2d 462, 466 (Mo. Ct. App. 1941). Hager points to an agency agreement between Engler's employer and Home Insurance, but the express authority granted to Engler's employer is limited to the receipt of proposals and the cancellation of insurance or bonds. (Doc. 106, Ex. 43). Hager makes no argument that Engler or his employer had implied authority to process claims for

---

[13]Mr. Burdt has managed Hager's insurance program since 1980 and has been Hager's Chief Financial Officer since 1996. (Doc. 106, Ex. 7, p. 7-10). One of his duties is reporting claims. *Id.* at p. 19-20, 226-27. From 1983 to the present, Hager has obtained insurance through Curt Engler in St. Louis. (Doc. 106, Ex. 1, p. 115; Ex. 7, p. 146-49; Ex. 8, Hager Response No. 11).

Home Insurance.[14] Hager also points to the deposition testimony of Roger Prickett[15] and argues that Mr. Engler's employer was an operating division of Aon and Aon had an agency relationship with U. S. Fire's parent, Crum & Forster. (Doc. 133, Hager Responses 79-81). However, Mr. Prickett explicitly testified that he did not know when Aon and Crum & Forster had an agency relationship, that he did not know the scope of any authority of Aon and that he did not know which Aon entity had an agency relationship with Crum & Forster. (Doc. 135, Ex. W, p. 19-23).[16] Hager does not point to any evidence in support of its argument that Engler was an agent of Central National.[17]

Accordingly, there is no evidence from which a jury could conclude that Hager provided notice to Home Insurance, Central National or United States Fire prior to the

_____

[14] Mr. Engler testified he was not involved with Hager's purchase of insurance from Home Insurance. (Doc. 106, Ex. 42, p. 131-32). He did not represent Hager or Home Insurance with regard to the purchase of the Home Insurance policies. *Id.* Engler testified he was not the proper party to receive notice of a claim for Home Insurance. (Doc. 106, Ex. 42, p. 132, 290-91).

[15] Hager did not identify Mr. Prickett, who is described in the cited exhibit only as "a witness." It was left to Central National and U.S. Fire to identify Mr. Prickett as non-party Crum & Forster's 30(b)(6) witness. (Doc. 149, p. 11).

[16] Mr. Engler testified that he was not the broker involved with Hager's purchase of the Central National or U.S. Fire policies and that he and his employers have never entered into any agreement with Central National or U.S. Fire relating to providing notice for claims. (Doc. 117, Ex. 44-47).

[17] Hager submitted an agency agreement between Maryland Casualty, Northern Insurance and Frank B. Hall & Company, dated September 1, 1991. (Doc. 135, Ex. BB). The agreement includes authority to forward claims to the insurance companies. *Id.* at section 5. Although Hager does not so state, Frank B. Hall was Engler's employer in 1992 prior to Aon Corporation's purchase of Frank B. Hall and the formation of Rollins, Hudig, Hall, an Aon operating division, at the end of 1992. (Doc. 135, Ex. R, p. 20-22). Engler testified that he was an agent for placing insurance between Maryland, Northern and Hager. (Doc. 117, Ex. 47). Northern and Maryland point to Engler's testimony that he did not specifically remember a phone call from Burdt regarding the Oxford contamination and that, if he had received a claim, he would have referred it to the Rollins, Hudig, Hall claims department. A factfinder will have to determine whether Burdt or Engler's testimony is to be believed on this point. Furthermore, Northern and Maryland have limited their summary judgment argument to the application of the pollution exclusion clause under Missouri law and the effect of late notice under Alabama law. They have not argued for summary judgment on the breach of contract claims. To the extent Northern and Maryland claim they are entitled to summary judgment under Missouri law, Hager has presented sufficient evidence of notice to raise a material question of fact as to whether Engler was an agent for Northern and Maryland and whether he received notice.

initiation of this lawsuit.  Hager argues the filing of this lawsuit was a sufficient claim for defense and indemnity.  However, the cases cited by Hager are inapposite.  *Stella v. DePaul Community Health Center*, 487 F. Supp. 1017, 1020 (E.D. Mo. 1980) and *Southland Corp. v. Gray*, 890 S.W.2d 398 (Mo. App. 1995) provide that a lawsuit satisfies a demand for payment.  The insurer's duty to defend is invoked  when the insured gives notice of the complaint or pleading which gives rise to the duty.  *Trans World Airlines*, 2001 WL 909018 at *7.  Where the insurer has lost its opportunity to defend, prejudice is presumed.  *Rocha v. Metro. Property and Cas. Ins.*, 14 S.W.3d 242, 248 (Mo. App. 2000).

As to Hager's claim that the insurers have a duty to defend with regard to proceedings with ADEM and others after the initiation of this suit, the court notes that it is now clear that the contamination at the Oxford site was not due to a sudden and accidental release of TCE, and that the loss is not within the coverage afforded by these policies.  *Hawkeye-Security Ins. Co. v. Iowa National Mutual Ins. Co.*, 567 S.W.2d 719  (Mo. App. 1978).

Accordingly, Home Insurance, Central National and United States Fire are entitled to summary judgment as to Hager's claims they owe a duty to defend.

### c.    **Breach of Contract**.

Home Insurance, Central National and U.S. Fire also moved for summary judgment as to Hager's claim that they breached their contracts with Hager by failing and refusing "to investigate and determine whether coverage might exist." (Complaint, ¶ 41(a)).  The movants were not given notice of Hager's claim prior to initiation of this lawsuit and they therefore could not be guilty of breach because their performance was prevented.  *Artcraft*

34

*Cabinet, Inc. v. Watajo, Inc.*, 540 S.W.2d 918, 925 (Mo. App. 1976).[18] Further, the court has found these insurers are not liable for defense or indemnity of Hager's claims related to the TCE contamination at the Oxford site. Accordingly, Home Insurance, Central National and United States Fire are entitled to summary judgment as to Hager's breach of contract claims.

## V.    Conclusion.

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this _____ of December, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

---

[18]Home Insurance also argues it has no duty to defend Hager because no suit has been brought against Hager. The Home Insurance policies provide ". . . the company shall have the right and duty to defend any suit against the insured seeking damages on account of such property damage . . . ." (Doc. 106, Ex. 1-6). No lawsuits have been brought against Hager as a result of the TCE contamination at issue here. The notice of violation Hager received from ADEM on April 7, 1994, (Doc. 135, Ex. Q) did not constitute a suit for damages under Missouri law. *General Dynamics*, 968 F.2d at 713. Accordingly, Home Insurance is entitled to summary judgment as to Hager's claim that its duty to defend was triggered by the ADEM letter.